UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CONSUMER ADVISORY BOARD, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Docket no. 91-CV-321-P-S |
| | ) |
| BRENDA HARVEY, et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |

**ORDER ON MOTION FOR RELIEF FROM JUDGMENT**

Before the Court is Defendants' Motion for Relief from Judgment (Docket # 371). On February 26, 2010, the Court held oral argument. Having considered the parties' written and oral arguments together with the entire record, the Court now GRANTS the Motion for reasons described herein.

**I.    BACKGROUND**

    **A.  Procedural History:  1975-1999**

Although Consumer Advisory Board has served as the named Plaintiff in this case since its inception, the actual Plaintiffs are a class that presently includes approximately 750 members.[1]  "The class consists of all persons who were or have been involuntarily confined residents of the Pineland Center at any time on or after July 3, 1975, or who were conditionally released from Pineland and in community placements at any time on or after July 3, 1975,

---

[1] As of October 2009, Defendant estimated that there were 754 class members.  (See Def.'s Motion for Relief from Judgment (Docket # 371) at 15.)  Plaintiffs indicated there were 755 class members in their response.  (See Pls.' Response (Docket # 375) at 12.)  At oral argument, Attorney General Mills mentioned that there were 738 class members remaining.

exclusive of those individuals admitted to Pineland for a specific medical service at Benda Hospital or for respite care for less than 21 days." (1994 Consent Decree (Docket # 66) II.)

This class was formed as the result of a 1975 lawsuit that challenged the conditions at Pineland Center. Until its closing in 1996, the Pineland Center served as a state-run institution for persons with various mental and developmental disabilities. This 1975 case—initially titled, Wuori v. Zitnay, D. Me. Docket No. 75-cv-80-P—was resolved by a consent judgment entered in July 1978 (hereinafter, the "1978 Pineland Consent Decree"). In 1983, following an extended period of active court supervision, Judge Gignoux held a hearing and entered an order that discharged Defendants from active supervision under the 1978 Pineland Consent Decree.

The Court next heard from the parties on October 23, 1991 when Plaintiffs filed the pending Complaint (Docket # 1), which alleged that Defendants were "substantially out of compliance" with the 1978 Pineland Consent Decree. (Compl. at 8.) Plaintiffs maintained that the 1978 Pineland Consent Decree remained "the controlling law in this jurisdiction with respect to the rights of citizens with mental retardation and continues to be vital and enforceable." (Id. at 14.)

The first two years of this case were spent litigating the vitality of the 1978 Pineland Consent Decree. Ultimately, the First Circuit concluded that the 1978 Pineland Consent Decree had not been "terminated" and thus this case seeking to enforce that decree could continue. See Consumer Advisory Board v. Glover, 989 F.2d 65, 68 (1st Cir. 1993). Following this First Circuit ruling, Judge Carter approved a class action settlement, which resulted in the entry of the Consent Judgment, dated September 28, 1994 (Docket # 66) (hereinafter the "1994 Consent Decree"). The 1994 Consent Decree explicitly terminated the earlier 1978 Pineland Consent Decree and replaced it with "a new document that is more relevant to Wuori class members, both

2

in light of the Defendants' plan to ultimately close Pineland Center and due to changes in the philosophy and delivery of services to individuals with mental retardation in the 1990s." (1994 Consent Decree (Docket # 66) I.3.)  Notably, because the parties in this case and the earlier Wuori case reached settlements, which resulted in the entry of consent judgments, the Court has never had occasion to determine when or how Defendants violated federal law with respect to their treatment of the Plaintiff class.

The 1994 Consent Decree contemplated that, at the very least, the Decree would "remain in full force and effect . . . until at least one year from the date there are no longer any class members residing at Pineland Center." (1994 Consent Decree IV.4.)  Given this provision, Defendants were not able to move for termination of the Decree until 1997.  Defendants, in fact, filed its first motion to terminate the Decree in 1998 (Docket # 114).  However, Defendants subsequently withdrew the Motion in 2000 after an audit of the State's compliance with the Consent Decree concluded the State had not achieved substantial compliance with many of the Decree's provisions.  (See April 2000 Sundram Audit Report (Docket # 232).)

### B.  Procedural History: 2000 - 2009

Following the 2000 audit, Judge Carter entered an Order of Reference (Docket # 246) appointing Clarence Sundram as the special master.  In the years that followed, Plaintiffs and Defendants engaged in a collaborative effort to make the standards laid out in the Consent Decree a reality for the class members and, in large part, for all developmentally disabled persons served by the same system.  As both sides have repeatedly acknowledged, the expertise and thoughtful oversight of Special Master Sundram has been critical in enabling Defendants to develop the improved system now in place.  The progress achieved by Defendants is well documented in the record via a "certification process" developed by the Special Master with

significant input from both parties. Both sides consented to the use of the certification process, which divided the Decree's requirements into eleven different subject areas, as the means for measuring substantial compliance with the various Decree requirements. For its part, the Court has entered over twenty orders adopting findings and conclusions of the Special Master.[2]

In 2008, this matter was reassigned to me. Since that time, all sides represented to the Court that once the certification process was completed, the next step would be termination or, at least, an end of the Court's active supervision of this case. After the June 24, 2009 Status Conference, the Court requested that the Special Master provide his final report and indicated that the parties should make other filings that would move the case to "its post-Consent Decree stage." (Order (Docket # 356) at 2.)

On October 9, 2009, the Court received Final Report of the Special Master (Docket # 366), which catalogs the progress made in implementing the 1994 Consent Decree. Shortly thereafter, Defendants filed the pending Motion for Relief from Judgment. Plaintiffs have vigorously opposed Defendants' Motion for Relief from Judgment. Their Response to Defendants' Motion includes a summary of events and representations that apparently led Plaintiffs to believe Defendants would not seek to unilaterally terminate the Decree (See Pls.' Resp. Ex. B (Docket # 375-2).) The Response also attaches multiple affidavits, including an affidavit from a former Commissioner of the Maine Department of Mental Health, Kevin Concannon, who once served as the named defendant in the Wuori case. Mr. Concannon asserts that the 1994 Consent Decree was "a solemn perpetual commitment, . . . the equivalent of perpetual law." (Concannon Aff. (Docket # 375-1) at 2.)

---

[2] See Docket #s 275, 276, 281-283, 286, 287, 290, 291, 306-311, 317, 337, 347, 383, 384, 386. For purposes of the pending motion, the Court considers all of these previously adopted findings as part of the evidentiary record.

4

In Plaintiffs' view, even if the certification process is completed, the State's perpetual commitment requires an intermediate step before termination. Plaintiffs' counsel specifically has argued for a "next court order" under which the Court would retain jurisdiction and serve as an avenue for review in case of backsliding by Defendants (as happened in Wuori). Overall, Plaintiffs had envisioned a more collaborative approach to the post-Consent Decree stage. However, changes outside the context of this case (most notably, the State's budget crisis) prompted Defendants to seek relief from the Consent Decree via the traditional adversarial process.

### C. The Current Status: 2010

Prior to holding oral argument on the Defendants' Motion, the Court took time to review the Special Master's Final Report and the docket as a whole. Following that review, the Court entered an order accepting the Final Report (Docket # 387). The Court's Order specifically made three findings:

(1) Defendants have substantially complied, in a numerical sense, with the provisions of the Consent Decree with the exception of implementation of informed consent policies and ISC recordkeeping requirements found in subsections 6(g) and 6(h) of Sections IX of the 1994 Consent Decree.
(2) In the course of implementing the Consent Decree and in preparation for a post-Decree world, many systems have been put in place that could serve as mechanisms for future compliance. These systems include the annual Person Centered Planning process, the Grievance and Appeal process, Advocacy Services, Adult Protective Services and Quality Assurances, as well as the systemic oversight and advocacy to be provided by the Maine Developmental Services and Oversight Board.
(3) Defendants' commitment to achieving compliance has existed and is evidenced by the Defendants' accomplishments in achieving substantial compliance over the course of several years. The Special Master found Defendants to be attentive to their responsibilities under the Court Orders. It is an open question whether, absent the Consent Decree's obligations and judicial supervision, Defendants would have been able to withstand the onslaught of continuing fiscal pressures as described in the Final Report. This is a case of Defendants who have made a substantial and sustained good faith and largely successful effort to achieve compliance.

(Order Accepting Final Report of the Special Master (Docket # 387) at 1-2 (internal quotations and citations omitted).)

As a result of its review, the Court also requested additional filings from Defendants regarding the continued deficiencies noted by the Special Master with respect to informed consent. Having now had an opportunity to review Defendants' supplemental filings on informed consent (Docket #s 393-395), the Court is satisfied that Defendants have achieved substantial compliance with any informed consent requirements contained (either explicitly or implicitly) in the 1994 Consent Decree.[3]

The question now before the Court is simply whether the record as a whole supports the termination of the 1994 Consent Decree.

## II.    STANDARD OF REVIEW

Defendants' pending motion invokes Federal Rule of Civil Procedure 60(b)(5), which, in relevant part, allows this Court to provide relief from the 1994 Consent Decree if the Decree has been "satisfied" or upon finding that "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). Under either prong, Defendants bear the burden of showing that they are entitled to relief from judgment. See, e.g., Horne v. Flores, -- U.S. ---, 129 S. Ct. 2579, 2593 (2009); Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383 (1992).

In this case, the language of the 1994 Consent Decree specifically lays out three criteria for assessing whether Defendants have "achieve[d] compliance" with the terms of the Decree:

(1) substantial compliance in a numerical sense with the terms of [the 1994] decree;
(2) mechanisms in place to assure future compliance; and
(3) a demonstrable commitment to achieving compliance.

---

[3] In making this finding, the Court states no opinion as to whether Defendants' informed consent policies and compliance with the same satisfy other federal or state laws.

(1994 Decree IV.7.) In short, by its very terms, if the Court finds that Defendants have met these three benchmarks, the 1994 Consent Decree has been satisfied and may be terminated.

Alternatively, in Horne v. Flores, 129 S. Ct. 2579 (2009), the Supreme Court recently expounded on the standard for terminating an "institutional reform" decree clarifying that courts must use a "flexible standard" under which Defendants are entitled to relief if continuing to apply the decree "is no longer equitable." Id. at 2593-95. Following Horne, this Court must take the 1994 Consent Decree and "ask[] only whether 'a significant change either in factual conditions or in law' renders continued enforcement of the judgment 'detrimental to the public interest.'" Id. at 2597 (quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384 (1992)).

### III. DISCUSSION

In light of the two Rule 60(b)(5) standards just laid out, the Court proceeds to consider (1) whether Defendants have met the 1994 Consent Decree standard for termination and (2) whether Defendants have met the Horne standard for relief from judgment.

#### A. Has the 1994 Consent Decree Been Satisfied?

The short answer: Yes. In answering this question, the Court examines the three benchmarks set out in the Consent Decree: (1) substantial compliance in a numerical sense, (2) mechanisms to assure future compliance and (3) a demonstrable commitment to achieving compliance.

First, with respect to substantial compliance, the record is now clear that the only items for which there is a lack of evidence showing substantial compliance are two specific recordkeeping requirements, which are listed in subsections 6(g) and 6(h) of the Professional

7

Services section of the Decree.  The unrebutted (albeit dated) evidence from Plaintiffs reflects some significant inaccuracies in Defendants' electronic records.  These inaccuracies can be attributed to Defendants' move to an electronic recordkeeping system (EIS), which was simply not envisioned by the 1994 Consent Decree.[4]

Accurate and accessible records as to each class member are undeniably a fundamental first step in protecting the welfare of class members.  In essence, recordkeeping is simply written evidence that the class members are in fact receiving the services and care they are entitled to under the law and the Decree.  If there were accurate records showing that class members actually were not receiving regular medical care, that would be a substantive and problematic lack of compliance.  Instead, the evidence suggests that class members are, in fact, receiving regular medical care.  The short-coming lies in the documentation of that care in EIS.  In short, the recordkeeping system as a whole is functionally sufficient but retains some evidence of technology-related growing pains.[5]  Under these circumstances, to withhold a finding of substantial compliance with the Decree would be to elevate form over substance.  As Defendants acknowledged in an exhibit provided to the Court at oral argument, recordkeeping is required by both state statute and various federal and MaineCare regulations.  (See Def. Ex. 2.)  These provisions will provide an adequate benchmark for recordkeeping into the future.

Second, the Court is similarly satisfied that adequate mechanisms are currently in place to assure future compliance with the other aspects of the Consent Decree as detailed in the exhibits provided by Defendants.  (See Defs. Exs. 1 & 2.)  The Court can certainly understand Plaintiffs' lingering concerns that the State could backslide like it did on the 1978 Pineland Consent

---

[4] The 1994 Consent Decree clearly only envisioned a world of paper records as evidenced by the requirement that records be "legible, dated, and signed." (1994 Consent Decree IX.6(g).)

[5] Notably, the move to electronic recordkeeping should ultimately serve to make records more accessible than if the records were solely maintained on paper as envisioned by the Decree.

Decree, especially in light of the fiscal pressures currently facing the State.  However, the fear that history may repeat itself will always be present and will require that the class members and those that advocate on their behalf to be forever vigilant.  While it may not be enough to quell Plaintiffs' fears, the record documents the numerous statutes and regulations as well as advocacy and oversight organizations, which, together, should serve to prevent backsliding and keep the current system operating at a level of substantial compliance.  To the extent Plaintiff has suggested that these statutes or regulations are subject to amendment or even repeal in the future, the Court does not believe that the mere ongoing democratic operations of the State's legislative and executive branches can serve a basis for withholding a finding that there are mechanisms in place to assure future compliance.

Finally, there can be little doubt that Defendants have exhibited a demonstrable commitment to achieving compliance with the Decree over the last decade.  This commitment bolsters the Court's belief that the mechanisms currently in place to assure compliance will not be immediately dismantled once the Decree is terminated.  To the extent Plaintiffs have viewed the filing of the pending motion and the unwillingness to consent to the Court's continuing jurisdiction as demonstrating an abandonment of this commitment, the Court simply disagrees. Rather, the Court refuses to make any adverse inference with respect to Defendants' commitment simply because they chose to utilize the adversary process and recognized procedural rules.

Having found that Defendants have met the benchmarks for termination of the 1994 Consent Decree, the Court concludes Defendants are entitled to relief from judgment.

### B. Is Applying the 1994 Consent Decree Prospectively No Longer Equitable?

Alternatively, the Court also believes that application of Horne v. Flores, 129 S. Ct. 2579 (2009), leads to the conclusion that Defendants are entitled to have the Decree terminated because applying it prospectively is no longer equitable. In considering the prospective application of the Decree, Horne instructs that extended federal supervision over "core state responsibilit[ies]" raises "heightened" and "sensitive federalism concerns," especially when "the passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights." Horne, 129 S. Ct. at 2593.

Plaintiff's Opposition, especially the affidavit of former Commissioner Concannon, can be read to suggest that the 1994 Consent Decree was intended to bind state officials in perpetuity, however, Horne explicitly advises federal courts that perpetual oversight of state government programs is improper absent a record of ongoing violations of federal law. Moreover, to the extent that the 1994 Consent Decree can be read to include multiple substantive requirements that extend beyond the requirements of the Constitution or federal law, the Decree falls squarely within the category of decrees that "bind state . . . officials to the policy preferences of their predecessors and may thereby 'improperly deprive future officials of their designated legislative and executive powers.'" Horne, 129 S. Ct. 2594 (quoting Frew v. Hawkins, 540 U.S. 431, 441 (2004)). Horne teaches that federal courts must take a flexible approach to such decrees to ensure "that 'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when circumstances warrant." Id. at 2595 (quoting Frew, 540 U.S. at 442).

Plaintiffs have attempted to distinguish this case from Horne by emphasizing two aspects of this case: (1) that the Plaintiffs are a closed class, which inherently limits the scope and duration of the Decree, and (2) that the 1994 Consent Decree reflects a settlement rather than a judgment following a trial. The Court does not believe that these two differences change the applicability of Horne to this case.

Undoubtedly, the closed class that is the subject of this Decree makes the case factually distinguishable from the consent decrees at issue in Horne and the Supreme Court's earlier decision in Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992). It may well be possible in such a closed class case to have a consent decree that provides a "lifetime remedy . . . consciously designed to endure for specifically identified [class members] for their lifetimes" without running afoul of Horne. (Pls.' Response (Docket # 375) at 11 & 20.) However, the plain language of the Decree does not contemplate a "perpetual" or "lifetime" Decree. Rather, it contemplates the potential for termination within a year of the closing of Pineland Center if the delineated benchmarks are met. Given this explicit language limiting the duration of the Decree, the Court cannot extend the Decree based on other evidence of perpetual promises by state officials. Rather, Plaintiffs only available remedy for any such perpetual commitment, which is not contained within the four corners of the 1994 Consent Decree, lies with the State, not this Court. See Frew v. Hawkins, 540 U.S. 431, 442 (2004) ("The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials.")

With respect to the nature of the Decree as a settlement, Frew v. Hawkins, 540 U.S. 431 (2004), similarly involved a consent decree entered as the result of a settlement with state officials. In Frew, the Supreme Court explicitly addressed the application of Rule 60(b)(5) in the

context of requests by state officials to modify decrees entered as settlements. As in Horne, the Supreme Court indicated that federalism concerns must be given significant weight when the Court is asked to exercise its equitable powers under Rule 60(b)(5). See id. at 442. Thus, Frew and Horne both suggest that federalism concerns remain at the forefront regardless of whether the consent decree from which state officials seek prospective relief was entered as the result of a trial or a settlement. Notably, the First Circuit in the earlier appeal of this case similarly indicated that institutional reform decrees "whether consented to or not" are subject to similar review under Rule 60(b). See Consumer Advisory Board, 989 F.2d at 67 ("Ongoing decrees to reform public institutions, whether consented to or not, are adopted by courts subject to [the power to terminate] regardless of whether the parties would like to bind the court forever.")

Ultimately, in exercising its equitable power to provide prospective relief from judgment, the Court must consider whether the objectives of the Decree have been satisfied and whether a durable remedy has been implemented. See Horne, 129 S. Ct. at 2595 ("If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper.") In this case, various state statutes have been enacted to serve as the durable remedy. These statutes include the provisions for the Maine Developmental Services Oversight and Advisory Board, which is to be established pursuant to 34-B M.R.S.A. § 1223 after the State is released from all obligations under the 1994 Consent Decree. In short, the record before the Court provides ample evidence that Defendants have the commitment and mechanisms to continue to provide a system that will protect the class members' rights under the Constitution and federal law. Thus, continuing to monitor Defendants for compliance with the Consent Decree's numerous requirements is inequitable. On this alternative basis, the Court concludes Defendants are entitled to have the 1994 Consent Decree terminated.

## IV. CONCLUSION

For the reasons explained above, the Court hereby GRANTS Defendants' Motion for Relief from Judgment (Docket # 371) and TERMINATES the 1994 Consent Decree (Docket # 66). In doing so, the Court FINDS that Special Master Clarence Sundram has completed all of the tasks required by the Court's Order of Reference and he is hereby DISCHARGED as special master with the Court's sincere gratitude for his tireless efforts.

SO ORDERED.

                                                        /s/ George Z. Singal
                                                        United States District Judge

Dated this 19th day of March, 2010.